UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| SHANON EDMISTON, individually; and HELEN HOLMAN, as dependent administrator of, and on behalf of, LISA WILLIAMS a/k/a LISA SCHUBERT, E.S., J.S. #1, J.S. #2, SHANON EDMISTON, the ESTATE OF JOHN ROBERT SCHUBERT, JR., and JOHN ROBERT SCHUBERT, JR.'S heirs-at-law, | § § § § § § § § | |
| | § | CIVIL ACTION NO. 3:21-CV-132 |
| Plaintiffs, | § § | JURY DEMANDED |
| | § | |
| v. | § § | |
| CULBERSON COUNTY, TEXAS, OSCAR BORREGO SR., OSCAR E. CARRILLO, ERNESTO DIAZ, PETER E. MELENDEZ, and ADELAIDA ZAMBRA, | § § § § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **This is a case of a tragic inmate suicide resulting from violation of constitutional rights. Defendants' deliberate indifference, objective unreasonableness, and/or policies, practices, and/or customs caused John Robert Schubert Jr.'s suffering and death.**



Table of Contents

I.    Introductory Allegations ............................................................................4

      A.    Parties ................................................................................................4

      B.    Jurisdiction and Venue.......................................................................8

II.   Factual Allegations ....................................................................................9

      A.    Introduction .......................................................................................9

      B.    John Robert Schubert, Jr. ..................................................................9

      C.    John's July 6, 2019 Arrest .................................................................9

      D.    John's Suicide in the Culberson County Jail ..................................10

      E.    Witnesses .........................................................................................10

            1.    Borrego, Sr., Oscar – Jailer ...................................................10

            2.    Carrillo, Oscar E. – Sheriff ...................................................12

            3.    Diaz, Ernesto – Deputy .........................................................16

            4.    Melendez, Peter E. – Deputy .................................................17

            5.    Zambra, Adelaida – Dispatcher/Jailer...................................20

      F.    Investigations ..................................................................................23

            1.    Medical Records and Death Reports.......................................23

                  a.    EMT Records ................................................................23

                  b.    Autopsy Report ............................................................23

                  c.    Custodial Death Report (Filed with Attorney General)...........23

                  d.    Inmate Death Report (Filed with Texas Commission on Jail Standards) ................................................................23

            2.    Texas Rangers ........................................................................24

            3.    Texas Commission on Jail Standards .................................25

      G.    Defendants' Knowledge and Education............................................36

            1.    Jail Suicides Are a Well-Known, Widespread Problem. ...................36

            2.    Fifth Circuit's Clearly-Established Law: Continuous Observation .....40

      H.    *Monell* Liability of Culberson County ...........................................41

            1.    Introduction............................................................................41

            2.    Culberson County Policies, Practices, and Customs ...........................43

|  |  | a. | Policies, Practices, and/or Customs | 43 |
|  |  | b. | Suicide of Melody Kopera in Culberson County Jail | 46 |
|  |  | c. | TCJS Records Demonstrating Culberson County Practices and/or Customs | 59 |

III. Causes of Action ............................................................................................ 62

A. 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ................................. 62

B. Remedies for Violation of Constitutional Rights ........................................... 65

C. Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ............................................................. 66

D. Cause of Action Against Culberson County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................................................... 70

IV. Concluding Allegations and Prayer ................................................................. 72

A. Conditions Precedent ...................................................................................... 72

B. Use of Documents at Trial or Pretrial Proceedings ....................................... 72

C. Jury Demand ................................................................................................... 73

D. Prayer .............................................................................................................. 73

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.      Introductory Allegations

        A.      Parties

1.      Plaintiff Shanon Edmiston ("Ms. Edmiston") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Ms. Edmiston sues in her individual capacity, as the natural and legal mother of John Robert Schubert, Jr., and she seeks all wrongful death and other damages available to her.

2.      Plaintiff Helen Holman ("Ms. Holman") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Ms. Holman sues in her capacity as the Dependent Administrator of the Estate of John Robert Schubert, Jr., Deceased.  John Robert Schubert Jr. is referred to herein at times as "Mr. Schubert," "John," or the "Decedent."  Ms. Holman, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all of John's wrongful death beneficiaries (including Ms. Edmiston [John's mother], Lisa Williams a/k/a Lisa Schubert [John's wife], E.S. [John's minor daughter], J.S. #1 [John's minor son], and J.S. #2 [John's minor daughter]) and on behalf of John's estate and all of John's heirs-at-law, including Lisa Williams a/k/a Lisa Schubert (John's wife), E.S. (John's minor daughter), J.S. #1 (John's minor son), and J.S. #2 (John's minor daughter).  All of the people listed in the immediately preceding sentence, other than Ms. Edmiston and Ms. Holman, are collectively referred to herein as the "Claimant Heirs."  Ms. Holman asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, Ms. Edmiston and Claimant Heirs. Letters of Dependent Administration were issued to Ms. Holman in year 2021, in Cause Number

PR-3023, in the County Court of Winkler County, Texas, in a case styled *Estate of John Robert Schubert, Jr., Deceased.*

3.       Defendant Culberson County, Texas ("Culberson County" or the "County") is a Texas county.  Culberson County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Carlos G. Urias, at Culberson County Courthouse, 300 La Caverna St., Van Horn, Texas  79855, or wherever Honorable County Judge Carlos G. Urias may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  Culberson County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983 and the United States Constitution).  Culberson County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages and death referenced in this pleading.

4.       Defendant Oscar Borrego Sr. (sometimes referred to herein as "Mr. Borrego" or "Jailer Borrego") is a natural person who resides, is domiciled, and may be served with process at 305 Crockett Street, Van Horn, Texas  79855.  Mr. Borrego's listed address is P.O. Box 1411, Van Horn, Texas  79855.  Mr. Borrego may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Borrego at Mr. Borrego's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Borrego is being sued in his individual

capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Borrego was employed by Culberson County at all such times and acted or failed to act in the course and scope of his duties for Culberson County.

5.      Defendant Oscar E. Carrillo (sometimes referred to herein as "Mr. Carrillo" or "Sheriff Carrillo") is a natural person who resides, is domiciled, and may be served with process at 1004 Crockett Street, Van Horn, Texas  79855.  Mr. Carrillo's listed address is P.O. Box 913, Van Horn, Texas  79855.  Mr. Carrillo may also be served with process at his place of employment, Culberson County Sheriff's Office, 300 La Caverna St., Van Horn, Texas 79855.  Mr. Carrillo may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Carrillo at Mr. Carrillo's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Carrillo is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Carrillo was employed by Culberson County at all such times and acted or failed to act in the course and scope of his duties for Culberson County.

6.      Defendant Ernesto Diaz (sometimes referred to herein as "Mr. Diaz" or "Deputy Diaz") is a natural person who resides and is domiciled, upon information and belief, in El Paso, Texas.  Mr. Diaz may be served with process at his place of employment, Culberson County Sheriff's Office, 300 La Caverna St., Van Horn, Texas 79855.  Mr. Diaz may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving

a copy of this complaint and a summons directed to Mr. Diaz at Mr. Diaz's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Diaz is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Diaz was employed by Culberson County at all such times and acted or failed to act in the course and scope of his duties for Culberson County.

7.     Defendant Peter E. Melendez (sometimes referred to herein as "Mr. Melendez" or "Deputy Melendez") is a natural person who resides, is domiciled, and may be served with process at 3301 Kilkenny Rd., El Paso, Texas  79925.  Mr. Melendez may also be served with process at his place of employment, Culberson County Sheriff's Office, 300 La Caverna St., Van Horn, Texas 79855.  Mr. Melendez may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Melendez at Mr. Melendez's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Melendez is being sued in his individual capacity, and he acted at all relevant times under color of state law.  His actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Mr. Melendez was employed by Culberson County at all such times and acted or failed to act in the course and scope of his duties for Culberson County.

8.     Defendant Adelaida Zambra (sometimes referred to herein as "Ms. Zambra," "Officer Zambra," "Jailer Zambra," "Dispatcher/Jailer Zambra," or "Dispatcher Zambra") is a natural person who resides, is domiciled, and may be served with process at 408 Rivas Street, Van Horn, Texas 79855.  Ms. Zambra's listed address is P.O. Box 811, Van Horn, Texas  79855.  Ms.

Zambra may also be served with process at her place of employment, Culberson County Sheriff's Office, 300 La Caverna St., Van Horn, Texas 79855.  Ms. Zambra may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Zambra at Ms. Zambra's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Zambra is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Her actions and inaction were moving forces behind, caused, and proximately caused constitutional violations and resulting damages and death referenced in this pleading.  Ms. Zambra was employed by Culberson County at all such times and acted or failed to act in the course and scope of her duties for Culberson County.  All natural person Defendants (Oscar Borrego Sr., Oscar E. Carrillo, Ernesto Diaz, Peter E. Melendez, and Adelaida Zambra) are collectively referred to in this complaint as the "Individual Defendants."

> B.     Jurisdiction and Venue

9.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over Culberson County because it is a Texas county.  The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.  Venue is proper in the El Paso Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  All Defendants are residents of Texas, and Mr. Melendez, and likely Mr. Diaz, are residents of the Western District of Texas, El Paso Division, by being residents of El Paso, Texas.

II.      Factual Allegations

    A.      Introduction

    10.      Plaintiffs provide in factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, Plaintiffs have done Plaintiffs' best to do so accurately and without any typographical errors.

    B.      John Robert Schubert, Jr.

    11.      John was born in Monahans, Texas in 1984.  He loved his children, and his favorite pastime was going to their games.  John enjoyed camping, fishing, barbequing, and virtually anything outdoors.  He also loved music and dancing.  John died a completely unnecessary and preventable death at the age of 35.

    C.      John's July 6, 2019 Arrest

    12.      John was wandering about the town of Van Horn late on the evening of July 6, 2019. He knocked on at least one door and told the resident that someone was trying to kill him. He also told at least one other person in the area that someone was trying to kill him. Upon information and belief, this was false. Further, it was apparent to anyone interacting with John that

he was not in his right mind and needed immediate mental health treatment to avoid injury to himself or others. John's subsequent arrest, and his preventable suicide in the Culberson County jail, are described with more specificity below.

### D.    John's Suicide in the Culberson County Jail

13.    John suffered a tragic, completely preventable death as a result of his suicide attempt in the Culberson County jail. Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction, and Culberson County's policies, practices, and/or customs, caused, were proximate causes of, and were producing causes of John's suffering and death.

### E.    Witnesses

14.    Plaintiffs provide in this section, as above, information at times obtained from statements and/or reports drafted by certain people. Information obtained from these statements and/or reports may be inconsistent at times, and conflict with information in statements and other reports of persons referenced in this pleading. However, indulging all inferences in Plaintiffs' favor, even when there are inconsistencies or differences, which Plaintiffs may note only at times. Plaintiffs state plausible claims for deliberate indifference and/or objective unreasonableness of Individual Defendants and for *Monell* claims against the County.

#### 1.    Borrego, Sr., Oscar – Jailer

15.    Jailer Borrego provided a statement to Texas Ranger Torrez. Ranger Torrez, as described elsewhere in this pleading, investigated any alleged criminal conduct causing John's death. Jailer Borrego said that he received a "911" call at approximately 11:05 p.m. on July 6, 2019. He said the call was about someone asking for help. The male caller said that someone was

trying to kill him.  Jailer Borrego also said that he received another call from an off-duty trooper, at approximately 11:09 p.m., saying that a man was at his door saying that someone was trying to kill him.  This man, and the male caller, were the same person - John. Upon information and belief, Jailer Borrego formed the opinion, based upon that information as well as information he learned later, that John was mentally ill and needed immediate mental health treatment. John did not need to be jailed.

16.     Jailer Borrego also said that, at approximately 11:12 p.m., he told Deputy Melendez about the calls.  Jailer Borrego said that he also received a call at approximately 11:12 p.m. from the El Capitan Hotel in Van Horn saying that a man told the clerk that someone was trying to kill him.  Jailer Borrego said that he told Deputy Melendez, and that Deputy Melendez went to the hotel and located John.

17.     Jailer Borrego also said that, on July 7, 2019, at approximately 12:14 a.m., Deputy Melendez brought John to the jail.  Deputy Melendez put John into the booking area.  Jailer Borrego said that Jailer Borrego's relief officer arrived at roughly the same time that Sheriff Carrillo was calling the jail to check on John. Upon information and belief, the relief officer to which Jailer Borrego referred was Dispatcher/Jailer Zambra.

18.     Jailer Borrego changed John into jail clothing and put him into Cell Number 4.  He said that he did so because Ms. Zambra would be alone, and it would be easier for her to keep an eye on John.  When Jailer Borrego changed John into jail clothing, he, like all other Individual Defendants, knew that suicidal inmates commonly use jail clothing to form ligatures to commit suicide.  Jailer Borrego, and all other Individual Defendants, likewise knew that a person on suicide watch and/or at risk of self-harm should not be allowed to be in a cell with physical items with which the person can form a ligature and commit suicide in the most common method.

19.     Jailer Borrego indicated that he changed John into jail clothing at approximately 1:35 a.m. and left the jail at approximately 1:48 a.m.  Jailer Borrego said that when he left, Sheriff Carrillo and Deputy Diaz also left.  Upon information and belief, all three men knew, when they left, that a jail intake of John had not been completed, including completion of the Texas Commission on Jail Standards–required form regarding mental and/or medical issues described below in this pleading.  Likewise, upon information and belief, all three men knew the import of failing to complete that form, including that John should have been immediately placed on continuous suicide watch.  Finally, upon information and belief, all three men knew that John had been dressed-out into jail clothing with which he could form a ligature and commit suicide.

20.     Jailer Borrego said that, at approximately 3:03 a.m., he received a phone call from Dispatcher Zambra.  She said to Jailer Borrego that John had hung himself in the jail.  Jailer Borrego then returned to the jail.

## 2.     Carrillo, Oscar E. – Sheriff

21.      Sheriff Carrillo also provided a statement to Ranger Torrez.  He said that, on July 6, 2019, he was monitoring his handheld radio and heard Culberson County Sheriff's Office dispatch send Deputy Melendez to the vicinity of Date Street regarding a male knocking on an off-duty trooper's residence door asking for help.  He then heard dispatch tell Deputy Melendez that the subject, who he later learned was John, was now at the lobby of the El Capitan Hotel.  Upon information and belief, the El Capitan Hotel was at the corner of Date Street and East Broadway in Van Horn, Texas.

22.     Sheriff Carrillo told Ranger Torrez that he checked on Deputy Melendez and was told that Deputy Melendez had taken John to a Border Patrol station for identification.  Sheriff Carrillo said that, at approximately 12:59 a.m. on July 7, 2019, Sheriff Carrillo learned that John

was in the booking room at the Culberson County jail.  He said that he decided to go to the jail and check on John and jail personnel.

23.     Sheriff Carrillo said that once he arrived at the jail, he was told that John was in the booking room and had a warrant for a parole violation.  He said that he spoke with John and asked what he was doing in Van Horn.  He said that John told him that he had hitchhiked from El Paso and was in a half-way house in Horizon, Texas.  He said that he had left the Horizon facility without permission and was not allowed to stay at the facility once he returned.  John told Sheriff Carrillo that they were mean to him at the facility, and that he had had enough.

24.     Ranger Torrez wrote:

Sheriff Carrillo stated Schubert appeared to be answering all of his questions. Sheriff Carrillo stated Mr. Borrego provided Schubert with dress out clothing and observed him put the jail-issued jail pants and shirt on. . . . Sheriff Carrillo stated [John] was escorted to a single jail cell and that Mr. Borrego was present during the interview [of John].

Sheriff Carrillo required Mr. Borrego to provide a mattress to John.  When he did so, he was aware that inmates will commonly use mattresses, by tearing them apart, to form ligatures to commit suicide.  Sheriff Carrillo said that he left the jail at approximately 1:48 a.m.  Sheriff Carrillo indicated that John appeared to Sheriff Carrillo to be cooperative and truthful in responses. However, as indicated elsewhere in this pleading, Sheriff Carrillo did not require that any intake occur, and he did not require that the legally-required Texas Commission on Jail Standards mental health evaluation form be completed.  Thus, independent from any other liability of Sheriff Carrillo for damages and death referenced in this pleading, Sheriff Carrillo has supervisory liability.

25.     Since the form had not been completed, as indicated elsewhere in this pleading, Sheriff Carrillo had to operate on the belief that John was suicidal.  Sheriff Carrillo was required to put John on a suicide watch.  Instead, he provided John with materials with which John could

kill himself, incarcerated John in a cell alone, and left the jail.  Upon information and belief, all other Individual Defendants knew that John had to be treated as suicidal, should have been put on a suicide watch, and was incarcerated in a cell alone, unobserved, with materials with which he could kill himself.

26.     Sheriff Carrillo further stated that, at approximately 2:47 a.m., he heard a radio call asking for him to return to the jail.  When he arrived, Dispatcher Zambra took him to Cell Number 4.  He saw John in a kneeling position with a sheet tied to his neck and suspended from a shelf in the cell.  Sheriff Carrillo said that he lifted John and placed him on the bed, removing the sheet from his neck.  He heard a gasp for air, but John was unresponsive.  Sheriff Carrillo said that he began CPR, and that he asked Dispatcher Zambra to contact EMS.  EMS medic Cody Davis arrived and helped administer CPR.

27.     Sheriff Carrillo said that John was very warm and limber.  He said that John was transported to the Culberson Hospital emergency room.  He was later told that John did not survive.  Ranger Torrez said that Sheriff Carrillo provided to him all paperwork regarding John's incarceration.

28.     Sheriff Carrillo also provided a typed statement, signed by him, and dated July 7, 2019.  The statement had thirty-four numbered paragraphs.  Upon information and belief, it may not have been entirely accurate.  Regardless, the following portions of that statement provide additional information related to John's death:

- Mr. Schubert appeared to be answering my questions and I asked him about his shirt because he was not wearing one and he said it was wet.  Paragraph 14.

- I asked Mr. Borrego to provide him with dress out clothing and observed him put the jail issue jail pants and shirt on without incident.  Paragraph 15.

- Mr. Shubert asked now what?  I asked him if he had a problem being detained with others and he said NO.  Mr. Shubert was asked about drug use and responded that was why he was in rehab in El Paso.  Paragraph 16.

- I informed Mr. Shubert I would follow up with the Parole Office in the morning but someone would be back to visit with him.  Paragraph 17.

- Mr. Borrego advised the cell had no mattress and was then instructed to go into the tank and get an extra one.  Paragraph 20.

- Mr. Borrego pulled a mattress from Tank B.  Paragraph 21.

- After he was secured in the cell we returned to dispatch and observed Jailer Borrego clock off duty with the electronic time machine at 1:48a.m.  Paragraph 22.

- Mr. Borrego asked me for a ride home so we left and I dropped him off and patrolled the city for a couple of minuets.  Paragraph 23.

- At approx. 02:47 am I heard a radio call out for 307 and 301 requesting us to the jail.  Paragraph 24.

- Upon my arrival at I was escorted by Jailer Lila Zambra to jail cell 4 where I observed detainee in a kneeling position with an apparent sheet tied to his neck and suspended from a shelf in the cell. The detainee was lifted and placed on a table and the sheet was removed from his neck area by simply pulling it off. Paragraph 25.

- Detainee was placed on the bunk and I heard a gasp for air but was unresponsive to my verbal commands.  I then began CPR and asked Lila to contact EMS. Paragraph 26.

- Deputy Sheriff Pete Melendez arrived and I instructed him to assist with compressions. I exited the cell to retrieve a defibulator and while returning to the cell Ms Zambra advised EMS was in route.  Paragraph 27.

- I then switched positions with Pete and when EMS Cody Davis arrived. Paragraph 28.

- Detainee was very warm to the touch and limber as I recall from lifting him from the kneeling position onto the table then onto the bunk.  Paragraph 29.

* * *

- PA at the hospital advised me the patient did not survive possibly out of oxygen to long.  Paragraph 31.

- Justice of the Peace Betty Velez was summoned to hospital. Paragraph 32.

- The Texas Ranger Mata was notified with no success but Texas Ranger Torres advised he would respond to the jail. Paragraph 33.

- The cell was secured and the hospital ER personnel was advised to leave the body as is until the Texas Ranger Investigator would arrive. Paragraph 34.

(Grammar, spacing, and spelling errors in original).

29.     Further, Sheriff Carrillo indicated his knowledge of what should have been done with John. He said that his "concern with persons detained under these circumstances" was that they needed to be assessed, and, if necessary, transferred to an El Paso hospital emergency room for evaluation. He knew that such evaluation was required, as he indicated through use of the phrase "emergency order," by Chapter 573 of the Texas Health and Human Resources Code. Upon information and belief, all Individual Defendants possess this knowledge and yet failed to have John transferred to the nearest in-patient mental health facility in compliance with Texas law and constitutional requirements.

3.     Diaz, Ernesto – Deputy

30.     Deputy Diaz also provided a statement to Ranger Torrez. Deputy Diaz said that, on July 7, 2019 at approximately 1:20 a.m., he arrived at the Culberson County jail. He saw Sheriff Carrillo talking to John in the holding cell. Deputy Diaz said that this occurred at the time John was being booked into the jail. However, contrary to Deputy Diaz's statement, as shown elsewhere in this pleading, John was never booked-in to the jail. He also said that Jailer Borrego was with Sheriff Carrillo when Deputy Diaz noticed Deputy Melendez walk into the jail building.

31.     Deputy Diaz said that he saw Sheriff Carrillo finish speaking to John and leave the building. Deputy Diaz said that he also saw Jailer Borrego give John a yellow jail suit. Jailer

Borrego then put John into Cell Number 4.  After John was locked into the cell, Deputy Diaz and Deputy Melendez left the building.  Deputy Diaz indicated that this was at approximately 1:48 a.m.

32.     As with other Individual Defendants, Deputy Diaz knew that John was provided with property with which he could form a ligature and kill himself. Moreover, like all other Individual Defendants, Deputy Diaz knew, upon information and belief, that the Texas Commission on Jail Standards–required mental health form (described elsewhere in this pleading) for John was not completed. He, like all other Individual Defendants, was familiar with the form and knew what had to be done if the form was not completed. He knew that John had to be placed on a suicide watch. He also knew that the only effective suicide watch would be continuous monitoring.

### 4.     Melendez, Peter E. – Deputy

33.      Deputy Melendez also provided a statement to Ranger Torrez.  Deputy Melendez said that, on July 6, 2019 at approximately 11:10 p.m., he was dispatched to a location in Van Horn regarding John knocking on a resident's door and saying that someone was trying to kill John. Deputy Melendez said that John was not present when he arrived at the scene.  Deputy Melendez therefore attempted to find John.  Dispatch (Jailer Borrego) notified Deputy Melendez, at approximately 11:13 p.m., that John was at the El Capitan Hotel.  Deputy Melendez arrived at the hotel at approximately 11:15 p.m. and talked to John.  Deputy Melendez said that John appeared nervous and said that people were trying to kill John.  Upon information and belief, Deputy Melendez knew that John had a significant mental illness such that he was a danger to himself or others.  Therefore, Deputy Melendez should have transported John to the nearest in-patient mental health facility in compliance with law and, moreover constitutional rights.

34.     Deputy Melendez said that John was able to tell him the day of the week and the approximate time, and that they were in Van Horn, Texas.  John provided his correct name and a date of birth which was correct other than alleged off by two years.  Deputy Melendez was ultimately able to locate John in a database after further investigation.  Deputy Melendez learned that John allegedly had an active warrant for an alleged parole violation.

35.     Deputy Melendez ultimately transported John to the Culberson County jail after arresting him.  Deputy Melendez said that he arrived at approximately 12:14 a.m. on July 7, 2019.  He said that he took John to the jail's holding cell, and Jailer Borrego took custody of John.  However, Jailer Borrego did not solely have custody of John.  Instead, Culberson County had custody of John.  Thus, no Individual Defendant can use the excuse that another Individual Defendant had custody of John.  Each Individual Defendant owed his or her own constitutional duties to John.

36.     Deputy Melendez was then dispatched to another call.  After that call, he returned to the jail and helped Jailer Borrego lock John into another cell.  Deputy Melendez said that this occurred at approximately 1:42 a.m.  Deputy Melendez then went back out on patrol.  Deputy Melendez said that John repeated that there was someone trying to kill him.  However, John could not give a name or description.  Thus, Deputy Melendez was well aware that John was not in his right mind.  He knew that John was mentally ill.  He likewise formed the belief that John was a danger to himself and/or others.  Therefore, he should have taken John to the nearest in-patient mental health facility pursuant to Texas law and constitutional requirements.

37.     Texas law was clear in requiring Deputy Melendez, and other Individual Defendants who were peace officers, to take John to an appropriate mental health facility, rather than transporting him to the County jail. The Texas Health and Safety Code, specifically Chapter

573, entitled "Emergency Detention," is unambiguous regarding duties of a peace officer who comes in contact with a person with mental illness and who, as a result, is at a substantial risk of harm unless the person is immediately restrained. Section 573.001 reads that a peace officer may take a person into custody, without a warrant, if the peace officer has reason to believe and does believe that (1) the person is a person with mental illness; and (2) because of the mental illness there is substantial risk of serious harm to the person or to others unless the person is immediately restrained, and there is insufficient time to obtain a warrant before taking the person into custody. The section indicates that a substantial risk of serious harm to such a person may be demonstrated either by the person's behavior, or by evidence of severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty. The section also indicates that a peace officer may form the belief that the person meets the criteria for apprehension on the basis of the apprehended person's conduct, or the circumstances under which the apprehended person is found.

38.    Chapter 573 also reads, explicitly, that a peace office who takes such a person into custody "shall immediately:"

Transport the apprehended person to:

- The nearest appropriate inpatient mental health facility; or

- A mental health facility deemed suitable by the local mental health authority, if an appropriate inpatient mental health facility is not available.

Further: "A jail or similar detention facility may not be deemed suitable except in an **extreme emergency**." (Emphasis added).  Such an emergency did not exist with regard to John.  The plain language of the statute contemplates a natural disaster or some similar catastrophic event.

39.    Upon information and belief, Deputy Melendez was fully aware of Chapter 573 and his obligation to transport John to an appropriate mental health facility. Moreover, information and

belief, considering other facts in this pleading, Deputy Melendez was deliberately indifferent to, and acted in an objectively unreasonable manner regarding, John's serious mental health needs. Instead of complying with the law, and providing constitutional protection to John, Deputy Melendez took John to the one location to which he should not have taken him – the County jail.

40.     In the alternative, to the extent evidence indicates other than what Plaintiff expects the evidence will indicate after further discovery, if Deputy Melendez and/or other Individual Defendant peace officers were unaware of Chapter 573 or had not been trained about Chapter 573 nor how to handle mentally ill people such as John, this would be an independent basis for a *Monell* claim against the County. In such a case, the County would not have appropriately supervised Deputy Melendez, allowing him to act on his own regard in John and people in his situation, and likewise would not have trained him for one of the most basic scenarios which he would face in the field. Nevertheless, even if Deputy Melendez had not been trained about Chapter 573 or sufficiently supervised, based upon his interaction with John, it was clear that he did not need to be taken to a jail, but instead to an appropriate mental health facility.  Deputy Melendez's failure to do so was objectively unreasonable and deliberately indifferent to John's constitutional rights.

41.     Plaintiffs do not allege that violation of Chapter 573 is a *per se* violation of constitutional rights.  Instead, Plaintiffs acknowledge and allege case law indicating that violation of departmental policy can be some evidence that a constitutional violation occurred.  Likewise, violation of a rule, statute, or standard can be some evidence that a constitutional violation occurred.

5.     Zambra, Adelaida – Dispatcher/Jailer

42.      Dispatcher Zambra also gave a statement to Ranger Torrez.  Dispatcher Zambra said that she began her shift on July 7, 2019 at approximately 12:14 a.m.  She said that Jailer

Borrego told her about John, and that he would book John into the jail so that Dispatcher Zambra could deal with dispatch.  Dispatcher Zambra also said that Sheriff Carrillo arrived at the jail and spoke to John.

43.     Dispatcher Zambra also said that, at approximately 1:48 a.m., Jailer Borrego came into dispatch to clock out.  He told Dispatcher Zambra that he put John into a single cell and requested a driver's license and criminal history check on John.  Upon information and belief, Dispatcher Zambra, as well as all Individual Defendants, knew that no one had completed the Texas Commission on Jail Standards–required form regarding mental health and certain physical issues described in this pleading below.

44.     Dispatcher Zambra said that she printed a copy of the driver's license and criminal history for John at approximately 2:17 a.m. and was dealing with radio traffic as well.  Dispatcher Zambra was communicating to the Texas Ranger the difficulty which County employees had working at the jail.  The jail was understaffed.

45.     Dispatcher Zambra said that, at approximately 2:28 a.m., she requested a medical history report on John.  Upon information and belief, this was a Continuity of Care Query ("CCQ").  She also said that, at approximately 2:36 a.m., detainee Ortega called her on the intercom and told her that Mr. Borrego had taken detainee Ortega's extra mattress for, upon information and belief, John.  Detainee Ortega wanted it back.  Dispatcher Zambra said that she told him that she was sorry.  Thus, Dispatcher Zambra was aware that John had more than one item in his cell with which he could form a ligature and commit suicide.

46.     Dispatcher Zambra said that, at approximately 2:42 a.m., she did her jail check manually.  The premises phone was not working since the earlier shift.  She said that she checked the female detainee in Cell Number 1 first, and then checked the other cells.  She said that when

she checked Cell Number 4, she could see John half-kneeling with a white sheet mangled on his

neck and tied to a top grey shelf.  Dispatcher Zambra then went to the catwalk hallway to better

see John.  She said that she called to him through jail bars, and there was no response.  She said

that then, at approximately 2:44 a.m., she called Deputy Melendez and Sheriff Carrillo and asked

that they come to the jail as soon as possible.

47.     Dispatcher Zambra said that Sheriff Carrillo arrived first and removed John from

the mangled sheet.  She said that he then laid John on the bunk and began CPR.  Sheriff Carrillo

told Dispatcher Zambra to call out the rescue team.  Dispatcher Zambra said that she called out the

rescue team at approximately 2:50 a.m.  She said that she received a "911" call at the same time

and sent a deputy to handle that call.  Dispatcher Zambra also said that Sheriff Carrillo and Cody

Davis were working on John.  Dispatcher Zambra had to go back to dispatch and work on radio

traffic, and she called Jailer Borrego to come to the jail to help her.

48.     Ranger Torrez wrote in his report:

> Dispatcher Zambra stated she has repeatedly told her supervisor of the lack of staff
> and being short of employees.  Dispatcher Zambra stated she has told them to hire
> more people and that some of the employees are working long hours and many days
> due to shortness of employees.

Ranger Torrez wrote nothing more regarding the statement provided by Dispatcher Zambra.  Upon

Information and belief, Dispatcher Zambra's complaint to her supervisor that the jail was short-

staffed, and likely that she was unable to do her job effectively (dealing with phone calls and

attempting to watch inmates) had been communicated to Sheriff Carrillo.  Further, upon

information and belief, neither the County nor Sheriff Carrillo did anything substantive before

John's death in response to Dispatcher Zambra's complaints.

F.      Investigations

1.      Medical Records and Death Reports

a.      EMT Records

49.     Medical records indicate that EMTs received a call at 2:50 a.m. on July 7, 2019, regarding an unresponsive male at the Culberson County jail.  The male was John.  EMTs dispatched at 2:56 a.m. and arrived at the jail 2:59 a.m.  John was not breathing, and he did not have a pulse.  The medical records indicate that Sheriff Carrillo said that John was found hanging from a noose, made by sheets, tied around his neck.  Moreover, medical records indicated, "Patient appeared unresponsive and unstable."  John died as a result of this suicide attempt.

b.      Autopsy Report

50.     The death certificate listed as cause of death, which was obvious to everyone involved, suicide through asphyxia due to hanging.  The autopsy reached the same conclusion.

c.      Custodial Death Report (Filed with Attorney General)

51.     The Culberson County Sheriff's Office filed with the Texas Attorney General a custodial death report regarding John's death.   The report provided very little additional information above that already referenced in this complaint regarding John's death.  The report, completed by Sheriff Carrillo, falsely represented that John did not exhibit any mental health problems.

d.      Inmate Death Report (Filed with Texas Commission on Jail Standards)

52.     Sheriff Carrillo also completed and filed with the Texas Commission on Jail Standards an Inmate Death Reporting Form for John's death.  Sheriff Carrillo indicated what he considered to be certain relevant times in that report, and he was forced to write "camera time" to

show times from the jail camera footage versus actual times. The fact that the jail could not even keep its camera time consistent with, or even close to, actual time was further evidence as to its deliberate indifference and disregard for the rights of inmates such as John.

53. Sheriff Carrillo wrote that Jailer Zambra was the person who found John, deceased. Sheriff Carrillo indicated that it was "unknown" whether John was under the influence of alcohol or drugs. He also admitted that John was not on suicide watch. Since no Individual Defendant conducted a jail intake of John, and asked him medical and mental health questions required by every known jail standard and the Texas Commission on Jail Standards, Sheriff Carrillo was forced to write, "Unknown" in response to the question asking that he list any and all known medical conditions.

### 2. Texas Rangers

54. As indicated above, the Texas Rangers investigated John's death. The Texas Rangers do not conduct investigations of custodial deaths to determine whether anyone violated constitutional rights of the decedent, or has civil liability for such death. Instead, the Texas Rangers investigate such deaths only to determine whether there is potential criminal liability.

55. On July 7, 2019, Ranger Juan Torrez conducted the potential criminal conduct investigation. He was called to the Culberson County jail at 300 La Caverna, Van Horn, Texas 79855. He arrived at approximately 7:23 a.m. and met with Sheriff Carrillo. Sheriff Carrillo told him that John was arrested and ultimately found hanging in his cell at approximately 2:45 a.m. Ranger Torrez viewed the cell in which John committed suicide, and he took a number of photographs. He also traveled to the Culberson Hospital in Van Horn. He went to Trauma Room Number 1 and took photos of John. He saw ligature marks on John's neck and noted in his report that John's body was taken to Legacy Mortuary for autopsy at a later time. Ranger Torrez obtained

a number of statements, summaries of which he provided in his report.  Plaintiffs provide portions of those summaries in the Witnesses section of this complaint.

### 3.        Texas Commission on Jail Standards

56.     The Texas Commission on Jail Standards ("TCJS") conducted an investigation of John's death.  The TCJS regularly conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing bare minimum jail standards.  The TCJS provided a summary of what it determined after its investigation of John's death:

## TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

August 8, 2019

Subject:       I/M John Robert Schubert Jr. SID# 06887176 Death-In-Custody Review
Date of Death: July 7. 2019 at approximately 0414 hours
Facility:      Culberson County Jail (IM pronounced at Culberson County Hospital)

Investigation reveals I/M Schubert, John was brought into the Culberson County Jail on July 6, 2019 at approximately 2259 hours. I/M Schubert was not booked into the facility, and the mental health screening form was not completed prior to I/M Schubert being placed into a single cell. The CCQ came back as 'no match' on July 7, 2019 at approximately 0227 hours.

Video provided by Culberson County appears to be approximately 1 hour and 12 minutes earlier than the actual time. At approximately 0125 hours (video time 0013 hours) an observation round was conducted. At approximately 0132 hours (video time 0021 hours), I/M Schubert was placed into a single cell after being changed into a Culberson County Jail uniform. At approximately 0245 hours (video time 0133 hours), while conducting a round, the on-duty jailer found I/M Schubert in his cell in a kneeling position, with a sheet tied around his neck and the other end secured to a shelf in the cell. The jailer advised dispatch who called for assistance. Culberson County Sheriff Oscar Carrillo arrived shortly thereafter and entered the cell to bring the inmate to the floor and initiate CPR. Another deputy arrived and CPR continued until the first of the first responders arrived at approximately 0256 hours. Additional first responders arrived at approximately 0300 hours, and continuing CPR, transported I/M Schubert to Culberson County Hospital at approximately 0317 hours. I/M Schubert was pronounced deceased at the hospital at approximately 0414 hours. Final autopsy and Ranger's investigative reports are pending.

Inspector Wendy Wisneski reviewed all submitted paperwork and video to ensure compliance with minimum jail standards. After careful review, it was determined there were two (2) violations of minimum standards and a notice of non-compliance was issued on August 8, 2019.

*Brandon J. Schubert*
8/8/2019

| Judge Bill Stoudt, Longview, Chair | Sheriff Dennis D. Wilson, Groesbeck | Commissioner Ben Perry, Waco |
|---|---|---|
| Dr. Esmaeil Porsa, M.D., Parker, Vice-Chair | Sheriff Kelly Rowe, Lubbock | Duane Lock, Southlake |
| Melinda E. Taylor, Austin | Patricia M. Anthony, Garland | Monica McBride, Alpine |

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

57.     As indicated the TCJS determined that the Culberson County jail failed to meet minimum jail standards, and it issued a notice of non-compliance to Culberson County as a result. The TCJS did not make a rash decision.  TCJS Inspector Wendy Wisneski determined that the TCJS should issue to Culberson County a notice of non-compliance.  TCJS Assistant Director Shannon Herklotz then reviewed the determination and approved it.  TCJS Executive Director Branden Wood agreed and also approved issuance of a notice of non-compliance.

Suicide
2019

**Death in Custody Review Checklist**

Reviewed _____

Entered _____

Video ✓

| | |
|---|---|
| County/Facility: | Culberson |
| Inmates Name: | John Schubert Jr |

S.O. / SID Number: 6887176

Date of Death: 07/07/19

| | | |
|---|---|---|
| Booking Sheet: — | Autopsy Report: pending | CCQ Entry: ✓ |
| Suicide Screening: — | Final Report: pending | ↓ Magistrate Notification: ↓ |
| Observation Logs: ✓ | Other Reports: — | — |

**Inspector Review:**  See attached report.

Signature: _____  Date: 08/07/19

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

**Assistant Director Review:**  See attached report.

Signature: Shannon J Herhlot  Date: 8/7/2019

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

**Executive Director Review:**  CONCUR /ADD T.A. ON RED REVIEW FOR 30 MIN CHECKS IF NOT CLASSIFIED

Signature: Brand Wed  Date: 8/8/19

Recommendation(s):

☐ No violation(s) of Minimum Jail Standards noted.

☑ Technical assistance provided. (See attached Technical Assistance Memorandum)

☑ A notice of non-compliance was issued for failing to meet Minimum Jail Standards.

Notice of Non-Compliance Issued:  (Yes) or  No                    Created 9/20/2017

58.     The determination was made as a result of a special inspection caused by John's suicide.  The TCJS notified the Culberson County jail that, unless it cured its noncompliance, it could result an entry of a remedial order.



# Texas Commission on Jail Standards

Culberson County Jail

Van Horn, Texas     Administrative Noncompliance

August 8, 2019
Date(s) of Inspection

SUBJECT:     SPECIAL INSPECTION REPORT

State Law requires periodic inspections of county jail facilities (VTCA, Local Government Code, Chapter 351, VTCA, Government Code, Chapter 511; Chapter 297.8, Texas Commission on Jail Standards).

☑ The facility was inspected on the date(s) indicated above, and it was determined that deficiencies exist. You are urged: (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures. The Commission is available to discuss or assist you with the appropriate corrective measures required.

Failure to initiate and complete corrective measures following receipt of the Notice of Noncompliance may result in the issuance of a Remedial Order (Chapter 297.8, et seq.).

☐ This facility was inspected on the date(s) indicated above. There were no deficiencies noted and upon review of this report by the Executive Director of the Texas Commission on Jail Standards, a certificate of Compliance may be issued per the requirements of VTCA, Chapter 511 and Texas Minimum Jail Standards.

Authenticated:

*Wendy Wisneski, TCJS Inspector*

RECEIVED

AUG 08 2019

Texas Commission on Jail Standards

Inter-Office Use Only

Received by: _Jammie Linder_     Date _8.8.19_

Reviewed by: _Shannon J Herbet_     Date _8/8/2019_

cc:     Judge
        Sheriff

Individuals and/or entities regulated by the Texas Commission on Jail Standards shall direct all complaints regarding the commission procedures and functions to the Executive Director at: P.O. Box 12985 Austin, Texas 78711 (512) 463-5505 Fax (512) 463-3185 or at our agency website at www.tcjs.state.tx.us .

59.     Culberson County had within its documents, at its jail, a copy of the Screening Form for Suicide and Medical/Mental/Developmental Impairments.  As indicated in this pleading, the TCJS required that the form be completed in its entirety when any inmate was booked-in to the County jail.  It is extremely important to obtain information from an inmate at the time of booking, as the jail will then have additional information regarding that inmate (beyond that learned before arrest through the time of transport to the jail) and thereby be able to determine whether to house the inmate, and if so, whether continuous observation may be required.  That form is shown below.

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

| County: | Date and Time: | | | Name of Screening Officer: | |
|---|---|---|---|---|---|
| Inmate's Name: | | Gender: | DOB: | If female, pregnant? Yes ☐ No ☐ Unknown ☐ | |

Serious injury/hospitalization in last 90 days? Yes ☐ No ☐ If yes, describe:

Currently taking any prescription medications? Yes ☐ No ☐ If yes, what:

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐ No ☐ If yes, describe:

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐ No ☐ If yes, describe:

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used

*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe

*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐ No ☐ If yes, describe:

**\*If yes, Notify Medical or Supervisor Immediately**

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| *IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | | |
| 1c. Have you ever attempted suicide? If so, when and how? | | | |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | | |
| *IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted* | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | | |
| 8. Have you ever received services for emotional or mental health problems? | | | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | | |
| *IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | | |
| Additional Comments (Note CCQ Match here): | | | |

| Magistrate Notification Date and Time: Electronic or Written (Circle) | Mental Health Notification Date and Time: | Medical Notification Date and Time: |
|---|---|---|
| Supervisor Signature, Date and Time: | | |

60.     Individual Defendants failed to complete the form and failed to assure that other Individual Defendants complete the form.  Upon information and belief, this was a customary practice at the Culberson County jail.  In the alternative, this one incident, involving several County employees at the jail, all of whom were, upon information and belief, aware that the form was not completed, demonstrates single-incident liability of the County for failure to complete the form.  As a result of Individual Defendants refusing to complete the form, at the time John was brought to the jail, Individual Defendants did not learn whether John:

- had a serious injury or hospitalization in the prior 90 days;

- was taking any prescription medication;

- had any disability or chronic illness, such as diabetes, and/or hypertension;

- had a history of drug or alcohol abuse;

- thought he would have withdrawal symptoms from stopping the use of any medications or other substances, including alcohol and/or drugs, when he was in jail;

- had ever had a traumatic brain injury, concussion, or loss of conciousness;

- was thinking of killing or injuring himself that day and, if so, how;

- had ever attempted suicide and, if so, when and how;

- was feeling hopeless or had nothing to look forward to;

- was hearing any noises or voices other people don't seem to hear;

- believed that someone could control his mind or that other people could know his thoughts or read his mind.

- before arrest, was feeling down, depressed, or had little interest or pleasure in doing things;

- had nightmares, flashbacks, or repeated thoughts or feelings related to PTSD or something terrible from his past;

- was extremely worried he would lose his job, position, spouse, significant other, or custody of his children due to arrest;

- had ever received services for emotional or mental health problems;

- had been in the hospital for emotion/mental health issues in the prior year;

- had received services for emotional or mental health problems and/or been in the hospital for emotional or mental health issues in the past year, and if so, whether he knew his diagnosis;

- was ever told by teachers that he had difficulty learning; and/or

- had lost or gained a lot of weight in the last few weeks.

61.     Clearly, these questions are designed to determine whether John would have self-harm tendencies and/or intended to commit suicide.  Further, as to questions in the first section in the form, at least some of which John would have answered "Yes," the form required Individual Defendants to notify medical or their supervisor immediately.  As to the first four questions to be directed to John in the second section of the form, some of which John would have answered "Yes" if he were asked, Individual Defendants would have been required to notify their supervisor, a judge, and the local mental health department immediately.  As to questions numbered 1-12 in the form, at least some of which John would have responded "Yes" if asked, Individual Defendants would have been required to notify their supervisor and a judge, as well as local mental health authorities when warranted.

62.     No Individual Defendant likewise answered the questions on the form as to whether John appeared to be under the influence of alcohol or drugs.  It is common knowledge among jailers and law enforcement officers that a person who is intoxicated is at a significantly higher risk of committing suicide in jail than a person who is not intoxicated.

63.     Notably, the second section of the form contains the questions, "Is the inmate unable to answer questions?  If yes, note why, notify supervisor and place on suicide watch until form completed."  Sheriff Carrillo indicated in his statement that John was able to answer

questions. Thus, there was absolutely no excuse for Sheriff Carrillo, or any other Individual Defendant, not to complete the form. Regardless, the form was clear in its instruction that a person was to be placed on suicide watch until the form was completed. Thus, all Individual Defendants had to operate under the belief that John was suicidal. Further, upon information and belief, all Individual Defendants knew that John was at a high risk of self-harm as a result of information they obtained related to his arrest and their knowledge that atypical or no answers to questions above would indicate that a person was at a high risk for self-harm. Thus, Individual Defendants had to place John on a suicide watch.

64.     The only effective suicide watch is continuous monitoring. It takes only approximately 5 minutes for a person to die from asphyxiation through use of a ligature. Use of a ligature is the most common way in which inmates committ suicide, as all Individual Defendants were aware from hearing news reports and from their education, training, and experience.

65.     Also, because Individual Defendants chose not to complete the form, they did not answer the question whether the arresting or transporting officer believed or had received information that the inmate may be at risk of suicide. Clearly, all Individual Defendants knew that John was not in his right mind. They knew that he was wandering around town, delusional and telling people that someone was trying to kill him. He continued with such comments when he was at the jail. He was clearly unreasonably in fear for his life, and likewise clearly suicidal as a result of information obtained and referenced in this pleading.

66.     The last section of the form required Individual Defendants, if there were any "Yes" answers, to notify their supervisor, a judge, and local mental health authorities immediately. Had Individual Defendants chosen to answer those questions, the anwer would have been "Yes" to at least one and possibly all four questions. Clearly, John was showing signs of mental illness and/or

unusual behavior. He may have been seeing or hearing things that were not there, including possibly people he thought were attempting to kill him.

67. As a result of Individual Defendants refusing to complete the Screening Form for Suicide and Medical/Mental/Developmental Impairments, John was put into a cell and left alone for well over an hour, with the means to commit suicide. This violated every known jail standard, was unreasonable, and showed deliberate indifference.

68. The TCJS also had to issue a technical assistance memorandum to Culberson County as a result of John's death. Wendy Wisneski, TCJS inspector, wrote that technical assistance was provided and required:

> Ensure all inmates are properly classified prior to placing them into a single or multi-occupancy cell. Classification will be reviewed during your next annual inspection. If the practice of placing an inmate in a single or multi-occupancy cell prior to being classified is prevalent, a notice of non-compliance will be issued.

69. These violations of known and communicated TCJS standards were, in addition to Individual Defendants' unreasonableness and deliberate indifference, as a result of policies, practices, and/or customs of Culberson County. Therefore, Culberson County is liable for all damages asserted in this pleading as a result of such violations.

G.   Defendants' Knowledge and Education

1.   Jail Suicides Are a Well-Known, Widespread Problem.

70. Defendants knew that prisoners frequently commit suicide through hanging and/or asphyxiation, using items in their cells to form ligatures. Individual Defendants possessed this knowledge simply from hearing news media reports over the years, as well as through their experience, education, and/or training.

71.     Jail suicides, as all Defendants knew before incarcerating the Decedent, are a huge problem in the United States.  Over one thousand people died in local jails in 2016, and suicide was the leading cause of death.  Further, people in county jails are five times more likely than the general population to have serious mental illness, and two-thirds of such persons have a substance abuse disorder.  Many people experience serious medical and mental health crises after they are booked into a jail, including psychological distress and shock of confinement.  Defendants also knew when incarcerating the Decedent that most jail suicides occur by hanging/strangulation, with inmates using objects available to them as ligatures.  Inmates commonly use sheets, torn-up mattresses, clothing (including drawstrings), telephone cords, and trash bags.

72.     On or about July 9, 2015, the TCJS emailed to every Texas sheriff and every Texas county jail administrator, including Culberson County Sheriff Carrillo and Culberson County's jail administrator, a technical assistance memorandum regarding a number of recent suicides completed through use of phone cords in jails.

# TEXAS COMMISSION ON JAIL STANDARDS



**EXECUTIVE DIRECTOR**
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

## TECHNICAL ASSISTANCE MEMORANDUM

**To:**       **All Sheriffs and Jail Administrators**
**From:**   **Brandon Wood, Executive Director**
**Date:**    **July 9, 2015**
**Reference:**   **Length of Phone Cords in Holding and Detoxification Cells**

Since September of 2014, four (4) suicide hanging deaths involving the use of telephone cords have occurred in Texas jails. These incidents have demonstrated that changes must be made if a jail chooses to place a telephone within a cell. A number of solutions have been suggested, including shortening cords or replacing standard telephones with a cord-free or hands-free type phones. A cord-free or hands-free type inmate phone that has a recessed, cordless handle is available, functioning similarly to a speaker-phone, but with the privacy of a telephone.

In each case, the telephone was located within the holding/detoxification cell, allowing the prisoners unhindered access at any time. Because of these incidents, two of the jails shortened their receiver cords to a total length of 12-16 inches. The telephones were otherwise unaltered, and are still in the same locations. The third jail replaced all phones in the holding, detoxification and separation cells with a cordless, hands-free phone. The fourth jail is planning to replace their phones in holding and detox with a hands-free telephone. These four incidents highlight the need to provide telephones that, if placed within holding cells or other jail cells, do not provide a possible means of suicide.

While there is no minimum jail standard that mandates the length of the telephone cords in Texas county jails, it is the recommendation of this agency that **ALL** phone cords be no more than twelve (12) inches in length.  While we cannot prevent every suicide that occurs, it is incumbent upon this agency to share these events with our stakeholders in order to try and prevent future suicide attempts to preserve lives.

**\*\*Note:**  In a Texas jail in 2002, a female inmate successfully committed suicide by hanging herself with a phone cord that measured 15 and ¾ inches in length.  The photo evidence of this hanging can be viewed by clicking on the following link: http://www.hawaii.edu/hivandaids/Suicidal_Hangings_in_Jail_Using_Telephone_Cords.pdf

Stanley D. Egger, Abilene, Vice Chair          Sheriff Dennis D. Wilson, Groesbeck          Dr. Michael M. Seale, M.D., Houston
Irene A. Armendariz, Austin          Sheriff Gary Painter, Midland          Larry S. May, Sweetwater
Jerry W. Lowry, New Caney          Allan D. Cain, Carthage
"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas

After Sheriff Carrillo and Culberson County received that technical assistance memorandum, they were reminded of the fact that prisoners would use anything to form ligatures and commit suicide. Therefore, they had to act as a result and not place suicidal detainees into cells with items with which they could form ligatures and kill themselves.

73.     The TCJS mandates use of the above-referenced Screening Form for Suicide and Medical/Mental/Developmental Impairments.  The screening form was drafted to achieve, as one of three goals, the creation of an objective suicide risk assessment with clear guidance for front-line jail personnel as to when to notify their supervisors and/or mental health providers and magistrates.  The TCJS indicates that intake screening "is the first step and is crucial to determine which inmates require more specialized mental health assessment."  Moreover, "Unless inmates are identified as *potentially* needing mental health treatment, they will not receive it."

74.     The TCJS also notes that purposes of intake screening are to enable correctional staff to triage those who may be at significant risk for suicide; identify prisoners who may be in distress for a mental health disorder/psychosis or complications from recent substance abuse; and assist with the continuity of care of special-needs alleged offenders.  The TCJS requires that an intake screening form be completed for all prisoners immediately upon admission into a jail facility.  Further, staff should perform additional screenings when they have information that a prisoner has developed mental illness, or the inmate becomes suicidal, at any point during the inmate's incarceration.  A jail must maintain any such additional screening forms in a prisoner's file.

75.     Suicides were not a novel occurrence and/or unknown issue to Defendants. Defendants were well-aware of the significant risk that the Decedent would commit suicide.  The County, in addition to having knowledge of the problem with jail suicides, as evidenced in part by

any County policies, practices, and/or customs referenced in this pleading in such regard, was put on notice well before the Decedent's incarceration that the County needed to have the appropriate policies, practices, and/or customs in place to fulfill constitutional obligations to protect inmates.

76.     Upon information and belief, all Defendants knew that most jail suicides occur within the first few minutes, hours, or days of incarceration.  They possessed this knowledge from hearing news media reports over the years, as well as through their experience, education, and/or training.  Further, upon information and belief, all Defendants knew that a person who appears to be psychotic, out of touch with reality, or who views events as being other than those which are actually true are at a high risk of self-harm.  They possessed this knowledge from hearing news media reports over the years, as well as through their experience, education, and/or training.

### 2.     Fifth Circuit's Clearly-Established Law: Continuous Observation

77.     Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit approximately 30 years ago – in 1992 – unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care.  **Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.**

**What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice**; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.

So the plaintiff in this case did not prove that Henderson County adopted its policy of handling suicidal detainees with deliberate indifference to their medical needs. But that does not insulate Henderson County, or any other municipality, from liability in future cases. **Jailers and municipalities beware! Suicide is a real threat in the custodial environment. Showing some concern for those in custody, by taking limited steps to protect them, will not pass muster unless the strides taken to deal with the risk are calculated to work: Employing only "meager measures that [jailers and municipalities] know or should know to be ineffectual" amounts to deliberate indifference. To sit idly by now and await another, or even the first, fatality, in the face of the Henderson County tragedy, would surely amount to *deliberate* indifference.**

*Id.* at 395-96 (emphasis added).

Defendants were put on notice long ago that anything short of continuous monitoring of suicidal inmates was insufficient and violated the United States Constitution. The law was clearly established with specificity, and Defendants were charged with knowledge of it.

H.     *Monell* Liability of Culberson County

1.     Introduction

78.     Plaintiffs set forth in this section of the pleading additional facts and allegations supporting claims against the County pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978). It is Plaintiffs' intent that all facts asserted in this pleading relating to policies, practices, and/or customs of the County support such *Monell* claims, and not just facts and allegations set forth in this section. Such policies, practices, and/or customs alleged in this

pleading, individually and/or working together, were moving forces behind and caused the constitutional violations, and damages and death, referenced herein. These policies, practices, and/or customs are pled individually, alternatively, and collectively. The County knew, when the Decedent was arrested and incarcerated, that its personnel, policies, practices, and/or customs were such that it would not meet its constitutional obligations to provide appropriate care to, and protect, the Decedent.

79.     Moreover, Plaintiffs may set forth in this pleading certain policies which one or more Individual Defendants violated. Plaintiffs set forth such policies not necessarily to show liability against the County, but rather to show liability against those Individual Defendants. If a jailer or law enforcement officer violates his or her employer's policy, such violation can be some evidence of a constitutional violation.

80.     The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of the County as it related to its jail. The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege at the pleading stage the identity of the County's chief policymaker(s).

81.     There were several policies, practices, and/or customs of the County which were moving forces behind, caused, were producing causes of, and/or proximately caused the Decedent's suffering and death, and other damages referenced in this pleading. The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs

to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.      Culberson County Policies, Practices, and Customs

82.      Plaintiffs list beneath this heading the County's policies, practices, and/or customs which Plaintiffs allege, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including the Decedent's death.  Thus, the County is liable for all such damages.  Allegations in this portion of the complaint are made in addition to all other allegations supporting such liability.

### a.      Policies, Practices, and/or Customs

83.      The County had in place, at the time of John's suicide, a mental disability plan.  The County had that plan in place because it was required to do so by the TCJS.  However, upon information and belief, regardless of the written policy, the County's practice and custom was either to consistently violate the policy, not enforce the policy, and/or not train its employees to implement and apply the policy.  Further, to the extent Individual Defendants violated that policy, such violation is some evidence of a constitutional violation.

84.      The screening portion of the policy contained the requirement that, upon admission, all inmates would be screened using information including that obtained from completion of the above-referenced, what the County referred to as, Mental Disabilities/Suicide Intake Screening Form.  The written screening policy also required:

> Should an inmate refuse to answer questions on the screening form, the inmate will be asked to sign a waiver.  If the inmate refuses to sign, the officer shall make note of this refusal and sign and date the form.  If the inmate is unable to answer questions on the form, the officer shall make note of this inability, sign and date the form, place the inmate on suicide watch and notify a supervisor.  Should the inmate exhibit passive behavior that leads the officer to believe that the inmate may be a

threat to himself or others, the Jail Administrator or the Sheriff, and MHMR Unit Coordinator shall be notified for further placement/referral instructions.

Once again, upon information and belief, this written policy was not applied as a result of the custom and practice of the County jail. All Individual Defendants chose to violate this policy. John was not placed on a suicide watch when the form was not completed, and MHMR was not contacted. Instead, the form was ignored, and John was put into a cell, with the physical means to commit suicide. He was left in that cell for well over an hour, alone, providing far more than enough time for the suicide to occur. Suicide by asphyxiation takes only approximately 5 minutes or less.

85.    The County also had a policy, when an inmate attempted suicide, that at least two officers enter the cell in which the suicide has been or was being attempted. However, the County chose to staff its jail with only one person. Thus, to a moral certainty, when the County chose to require at least two officers enter a cell of a person committing suicide, such as John, but then chose to staff the jail with only one person, the County knew that it could not and would not effectively respond to an inmate's suicide attempt. This was clearly unreasonable and deliberately indifferent to the constitutional rights of inmates.

86.    Upon information and belief, the County had a policy, practice, and/or custom of not requiring arrestees to be taken to a local inpatient mental health facility in accordance with Chapter 573. There was no action by Individual Defendants regarding taking John to a local in-patient facility. The Sheriff, the likely chief policymaker for jail operations for the County, was involved in the decision regarding John.

87.    Upon information and belief, it was the County's policy, practice, and/or custom to not have a mental health professional on duty at the time arrestees were brought to its jail. Likewise, this policy, practice, and/or custom included the failure to conduct a mental health

evaluation at the jail of detainees who had significant mental health issues and/or were suspected of being suicidal.  This failure does not excuse Individual Defendants for failing to have John transferred to the nearest in-patient mental health facility.  Instead, this policy, practice, and/or custom worked together with other County policies, practices, and/or customs to cause damages and death referenced in this pleading.

88.     The County also had a written policy which allowed inmates who were known to be assaultive, potentially suicidal, mentally ill, or who had demonstrated bizarre behavior be checked at least once every 30 minutes. However, inmates could be observed on just an "as needed" basis. Thus, the County allowed unfettered discretion to its employees as to how often to observe a suicidal inmate.  This showed deliberate indifference to John, as it takes only approximately 5 minutes or less to commit suicide through use of a ligature.  It is unreasonable to allow unfettered discretion as to how often to make observations of such a person, and certainly not just once each 30 minutes.  A 30-minute observation schedule allows a person to commit suicide and not be found for approximately 25 minutes after the attempt is successful.

89.     Upon information and belief, the County's practice and custom was to fill its jail to overcrowding, while at the same time failing to staff its jail with a sufficient number of jailers which would allow it to meet its constitutional obligations.  Upon information and belief, at the time of John's death, there was in place an Intergovernmental Agreement between Hudspeth County and Culberson County regarding housing of Culberson County prisoners in the Hudspeth County jail.   In that agreement, Hudspeth County agreed to "house overflow prisoners" incarcerated in the Culberson County jail as long as Hudspeth County had available space.  Upon information and belief, those counties reached that agreement due to Culberson County consistently not having sufficient space to constitutionally house its inmates.  This custom and/or

practice in conjunction with that of not staffing the jail sufficient to meet its constitutional obligations, work together to cause the damages and death referenced in this pleading.

90.     Sheriff Carrillo admitted in March 2020 – far too late for John – that the jail was short-staffed.  He wrote a memo to a person in the County's Human Resources Department, and the Culberson County Auditor, regarding there being an agenda item that month for Sheriff Carrillo to brief County Commissioners regarding new jail positions.  He sought to add a Sheriff's administrative position and possibly one deputy sheriff.  Sheriff Carrillo wrote, "The plan was to relieve some staffing shortages and minimize the growing compensatory and overtime."

### b.      Suicide of Melody Kopera in Culberson County Jail

91.     Culberson County and Individual Defendants were put on notice – months before John's suicide – of the importance of completing the Screening Form for Suicide and Medical/Mental/Developmental Impairments and having continuous observation of inmates who are at risk of suicide.  Detainee Melody Kopera committed suicide in the Culberson County jail less than two years before John's suicide – on November 2, 2017. As with John's suicide, the TCJS found that Culberson County violated jail standards.

92.     Ms. Kopera was arrested merely for the offense of failing to identify herself.  She was apparently just a passenger in a vehicle that was traveling over the speed limit and which had an expired license plate/registration.  The TCJS provided a summary of what it determined after its investigation of Ms. Kopera's death.

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

December 5, 2017

Subject:        I/M Melody Kopera # 23267 Death-In-Custody Review
Date of Death:  November 2, 2017 at approximately 2136 hours
Facility:       Culberson County Jail (I/M pronounced deceased at Del Sol Medical Center, El Paso)

Investigation reveals I/M Kopera, Melody was processed into the Culberson County Jail on October 24, 2017 for Failure to Identify/Giving False Information. The suicide screening instrument was completed and the following indicators were noted:

- I/M Kopera indicated she had a history of drug use-Meth-two (2) years ago
- I/M Kopera indicated she suffered a head injury stating she believed she had a concussion
- Answered 'yes' to question 1c, stating she had attempted suicide by hanging 3-4 years ago
- Answered 'yes' to question 1 d, stating that she 'kind of' felt hopeless or had nothing to look forward to
- Answered 'yes' to question 4, stating that she was depressed all the time
- Answered 'yes' to question 5, stating that she suffered from PTSD, and Battered Woman's Syndrome
- Answered 'yes' to question 6, stating that she was worried someone might hurt or kill her as she had 'a \$2500 bounty in Las Cruces, New Mexico
- Answered 'yes' to question 8, stating that she had been receiving on-going services for emotional and mental health
- Answered 'yes' to question 9, stating she had a psychiatric evaluation 7 months ago
- Indicated on question 10 that she had been diagnosed with severe depression, suicidal ideations, anxiety, PTSD, and Battered Woman's Syndrome
- The screener indicated that I/M Kopera showed signs of depression on question 13

The Intake Screening Form for I/M Kopera indicated the following: 1. that her head hurt and she felt dizzy 2. she had received mental health services in Las Cruces; 3. she was depressed all the time and felt that way at the time the screening form was completed; 4. she attempted suicide by hanging 3-4 years ago; 5. two of her friends had passed away within the last year; and 6. She suffered from Juvenile Asthma, Heart Trouble-Heart Murmur, Hypertension, Drug Addiction-addicted to Meth two (2) years ago, Mental Illness-PTSD, Suicidal tendencies, anxiety and Battered Woman's Syndrome

I/M Kopera claimed she had injured her head when she fell off a truck the night prior to her arrest, but later claimed that her husband had beaten her severely. It was noted by the officer that during 'change out' I/M Kopera was extremely weak, shaking badly, and was extremely off balance. A request for medical treatment was submitted, but there is no indication she was seen.

| Judge Bill Stoudt, Longview, Chair | Sheriff Dennis D. Wilson, Groesbeck | Commissioner Ben Perry, Waco |
| Jerry W. Lowry, New Caney, Vice Chair | Sheriff Kelly Rowe, Lubbock | Duane Lock, Southlake |
| Larry S. May, Sweetwater | Dr. Esmaeil Porsa, M.D., Parker | Melinda E. Taylor, Austin |

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

The CCQ came back as a 'no match'. The magistrate was not notified and there is no indication on the screening form that mental health, medical, or a supervisor was notified. The inmate was not placed on observation.

On October 28, 2017, at 1442 hours, I/M Kopera was found hanging in her single cell. CPR was initiated and EMS contacted. I/M Kopera was transported to Del Sol Medical Center in El Paso, Texas and was released from custody of Culberson County. I/M Kopera remained in Del Sol Medical Center on life support until being pronounced deceased on November 2, 2017 at approximately 2136 hours.

Inspector Wendy Wisneski reviewed all submitted paperwork to ensure compliance with minimum jail standards. After careful review, it was determined that one (1) violation of minimum jail standards occurred and a notice of non-compliance was issued on December 5, 2017.

*Shannon J Hurlbert*
12/7/2017

Judge Bill Stoudt, Longview, Chair                Sheriff Dennis D. Wilson, Groesbeck          Commissioner Ben Ferry, Waco
Jerry W. Lowry, New Caney, Vice Chair             Sheriff Kelly Rowe, Lubbock                  Duane Lock, Southlake
Larry S. May, Sweetwater                          Dr. Esmaeil Porsa, M.D., Parker              Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

93.     As indicated, the TCJS determined that the Culberson County jail failed to meet minimum jail standards. Sheriff Carrillo was Sheriff of Culberson County at that time. The TCJS issued a notice of non-compliance to Culberson County as a result,  and the TCJS did not make a rash decision.   TCJS Inspector Wendy Wisneski determined that the TCJS should issue to Culberson County a notice of non-compliance.  TCJS Assistant Director Shannon Herklotz then reviewed the determination and approved it.  TCJS Executive Director Branden Wood agreed and also approved issuance of a notice of non-compliance.

_Suicide_
_2017_

**Death in Custody Review Checklist**

Reviewed_____

Entered 10/30/18

Video _____

**County/Facility:** Culberson

**Inmates Name:** Melody Kopera   S.O. / ~~SID Number:~~ 23267

**Date of Death:** 11/2/2017   10/24/18

**Booking Sheet:** ✓   **Autopsy Report:** pending   **CCQ Entry:** ✓

**Suicide Screening:** ✓   **Final Report:** pending 's   ↓ **Magistrate Notification:** ↓

**Observation Logs:** ✓   **Other Reports:** —   No

**Inspector Review:** _____ See attached report. _____

**Signature:** _____   **Date:** 12/5/2017

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards.

**Assistant Director Review:** _____ See attached report. _____

**Signature:** Shannon J. Herklotz   **Date:** 12/7/2017

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☒ Issue a notice of non-compliance for failing to meet Minimum Jail Standards. (see attached). ☑sw

**Executive Director Review:** CONCUR. RECOMMEN REVIEW OF ADDITIONAL FILES & REPORT

**Signature:** _____   **Date:** 12/7/17

**Recommendation(s):**

☐ No violation(s) of Minimum Jail Standards noted.

☐ Technical assistance provided. (See attached Technical Assistance Memorandum)

☑ A notice of non-compliance was issued for failing to meet Minimum Jail Standards.

**Notice of Non-Compliance Issued:**   (Yes)   or   No   Created 9/20/2017

Inspector Sowell reviewed random screening forms.
Corrective plan of action received 12/14/17.

* Re-certified by Inspector Sowell 02/21/18 ms

94.     The determination was made as a result of a special inspection caused by Ms. Kopera's suicide.  The TCJS notified the Culberson County jail, on December 5, 2017, that, unless it cured its noncompliance, it could result in entry of a remedial order.

 **Texas Commission on Jail Standards**

Culberson County Jail

Van Horn, Texas

December 5, 2017
Date(s) of Inspection

SUBJECT:    SPECIAL INSPECTION REPORT

State Law requires periodic inspections of county jail facilities (VTCA, Local Government Code, Chapter 351, VTCA, Government Code, Chapter 511; Chapter 297.8, Texas Commission on Jail Standards).

☑ The facility was inspected on the date(s) indicated above, and it was determined that deficiencies exist. You are urged: (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures. The Commission is available to discuss or assist you with the appropriate corrective measures required.

Failure to initiate and complete corrective measures following receipt of the Notice of Noncompliance may result in the issuance of a Remedial Order (Chapter 297.8, et seq.).

☐ This facility was inspected on the date(s) indicated above. There were no deficiencies noted and upon review of this report by the Executive Director of the Texas Commission on Jail Standards, a certificate of Compliance may be issued per the requirements of VTCA, Chapter 511 and Texas Minimum Jail Standards.

Authenticated:

*Wisnesk*

**Wendy Wisneski, TCJS Inspector**

Inter-Office Use Only

| | |
|---|---|
| Received by: | Date |
| Reviewed by: | Date |

cc:    Judge
       Sheriff

Individuals and/or entities regulated by the Texas Commission on Jail Standards shall direct all complaints regarding the commission procedures and functions to the Executive Director at: P.O. Box 12985 Austin, Texas 78711 (512) 463-5505 Fax (512) 463-3185 or at our agency website at www.tcjs.state.tx.us .

95.     The TCJS also notified Culberson County with specificity as to the standards

Culberson County violated.

**TEXAS COMMISSION ON JAIL STANDARDS**
**SPECIAL INSPECTION REPORT**

Facility Name:  Culberson County Jail                          Date:          December 5, 2017

| Item | Section | Paragraph | Comments |
|------|---------|-----------|----------|
| 1 | 273 | .5 (a) (2) | Identification.  Procedures for intake screening to identify inmates who are known to be or observed to be mentally disabled and/or potentially suicidal and procedures for compliance with Code of Criminal Procedure Article 16.22 and referrals to available mental health officials; |

**Inmate Kopera answered questions on the screening form that indicated she should have been placed on some type of suicide observation. There was no documentation submitted to prove that a referral was made to an available mental health official and there was no documentation submitted to prove that a magistrate was notified as required by Article 16.22 of the CCP for Inmate Kopera.**

*Wendy Wisneski -TCJS Inspector*

96.     Sheriff Carrillo, as he did regarding John's death, completed and filed with the

TCJS an Inmate Death Reporting Form.  Sheriff Carrillo admitted that Ms. Kopera was "found

suspended," thus indicating that she used an item as a ligature to commit suicide.  She was found

in Single Cell Number 2.  Sheriff Carrillo listed the last known contact by a jailer at 2:20 a.m., and

with Ms. Kopera being found suspended 22 minutes later – at 2:42 p.m.  He thus knew, from

experience at that point, that even a 22-minute watch would be insufficient for a suicidal inmate.

He knew that only continuous monitoring would be appropriate.

97.     Sheriff Carrillo also admitted that Ms. Kopera was not on suicide watch.  This was

an incredible determination, as the information obtained in the Screening Form for Suicide and

Medical/Mental/Developmental Impairments clearly indicated that she was suicidal.  This was the

same form that Sheriff Carrillo and other Individual Defendants chose not to complete for John.

They decided to be deliberately indifferent regarding John and his mental health issues. They simply wanted to go home and not do their jobs due to the late hour that John was arrested. This was patently unreasonable. Sheriff Carrillo also indicated in the Inmate Death Reporting Form that the Texas Rangers would investigate Ms. Kopera's death.

98.     Sheriff Carrillo responded to a TCJS email indicating, regarding Ms. Kopera, that there was no Magistrate form, that she was not on suicide watch, and that she was in a single cell.

---

**Wendy Wisneski**

| | |
|---|---|
| **From:** | Oscar Carrillo <culbersoncounty@gmail.com> |
| **Sent:** | Wednesday, November 29, 2017 2:06 PM |
| **To:** | Wendy Wisneski |
| **Subject:** | Re: melody kopera |

no magistration form, not on suicide watch, in a single cell  most women are housed in single cells

On Wed, Nov 29, 2017 at 11:27 AM, Wendy Wisneski <wendy.wisneski@tcjs.state.tx.us> wrote:

Thank you, sir. Do you have a copy of the magistrate notification? And was I/M Kopera on suicide observation? If so, what was the frequency of observation?


Wendy


**From:** Oscar Carrillo [mailto:culbersoncounty@gmail.com]
**Sent:** Wednesday, November 29, 2017 10:51 AM
**To:** Wendy Wisneski <wendy.wisneski@tcjs.state.tx.us>
**Subject:** melody kopera


6 documents

---

99.     The Screening Form for Suicide and Medical/Mental/Developmental Impairments regarding Ms. Kopera would have caused warning bells to go off in Sheriff Carrillo's head, as well as that of anyone else who would have reviewed it and had any experience in law enforcement and/or jails.

**Screening Form for Suicide and Medical/Mental/Developmental Impairments**

| County: *Culberson* | Date and Time: *10/24/2019 1939* | Name of Screening Officer: *Laura Barajas* |
|---|---|---|

Inmate's Name: *Kopiak Melody A* | Gender: F☑ M☐ DOB: ▮▮▮▮ | If female, pregnant? Yes ☐No ☐No ☐Unknown☐

Serious injury/hospitalization in last 90 days? Yes ☐No ☑If yes, describe: *N/A*

Currently taking any prescription medications? Yes ☐No ☑If yes, what: *N/A*

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐No ☑If yes, describe: *N/A*

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐No ☐If yes, describe: *Can't tell*

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used
*YES - METH Like 2 yrs Ago*

\*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe
*NO*

\*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☑No ☐If yes, describe:
*I think I have a concussion now*

\*If yes, Notify Medical or Supervisor Immediately

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | ✓ | N/A |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | ✓ | N/A |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | ✓ | N/A |
| 1c. Have you ever attempted suicide? If so, when and how? | ✓ | | Hanging 3-4 yrs Ago |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | ✓ | Kinda, NE |
| **IF YES TO 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | ✓ | N/A |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | ✓ | N/A |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | ✓ | | Depressed All The Time |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | ✓ | | PTSD- Battered Women's Syndrome |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | ✓ | | I have a $4,600 Bounty in Las Cruces - Don't want to Talk About it |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | ✓ | N/A |
| 8. Have you ever received services for emotional or mental health problems? | ✓ | | On Going |
| 9. Have you been in a hospital for emotional/mental health in the last year? | ✓ | | Psych Eval 7 mths |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. *SEVERE DEPRESSION/ Suicidal Idations/Anxiety/PTSD/Battered Women Syndrome* | ✓ | | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | ✓ | N/A |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | ✓ | N/A |
| **IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | ✓ | | Depression |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | ✓ | N/A |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | ✓ | N/A |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | ✓ | N/A |

Additional Comments (Note CCQ Match here): *No Match*

| Magistrate Notification Date and Time: Electronic or Written (Circle) | Mental Health Notification Date and Time: | Medical Notification Date and Time: |
|---|---|---|

Supervisor Signature, Date and Time:

(Highlighting in copy obtained from TCJS).

100.    Wendy Wisneski, then the Critical Incident Inspector for the TCJS, wrote to Sheriff Carrillo regarding what he needed to do to remedy issues in the Culberson County jail regarding suicide.

## Wendy Wisneski

| | |
|---|---|
| **From:** | Wendy Wisneski |
| **Sent:** | Friday, December 15, 2017 10:41 AM |
| **To:** | 'Oscar Carrillo' |
| **Cc:** | Shannon Herklotz; Shane Sowell; Jason Ross |
| **Subject:** | FW: Corrective Action Plan |
| **Attachments:** | tjc response.docx; Mental 07-27-10.pdf; SB 1849, TA Letter for Electronic Monitoring.pdf |

| **Tracking:** | Recipient | Delivery | Read |
|---|---|---|---|
| | 'Oscar Carrillo' | | |
| | Shannon Herklotz | Delivered: 12/15/2017 10:41 AM | Read: 12/15/2017 1:14 PM |
| | Shane Sowell | Delivered: 12/15/2017 10:41 AM | Read: 12/15/2017 10:46 AM |
| | Jason Ross | Delivered: 12/15/2017 10:41 AM | Read: 12/15/2017 10:43 AM |

Good morning, Sheriff Carrillo.

I am in receipt of your plan of action addressing the area of non-compliance. Please ensure you are adhering to the Operational Plan submitted to and approved by the Jail Commission in 2010 (attached). I recommend you review and update your plan(s) as needed. If your plan(s) is/are updated, to include incorporating new training mandates, please submit it/them to the Jail Commission for approval.

Please ensure your personnel receive training on how to properly complete the suicide screening instrument, and on proper notification to required entities. Please ensure procedures are in place for placing inmates on suicide precautions, if needed, and personnel are trained on these procedures. Please provide copies of in-service training attendance rosters.

Additionally, please submit a floor plan identifying locations of any electronic monitoring devices and/or cameras serving 'at risk' cells. (Please see attached Technical Assistance Memo dated November 10, 2017).

If you require additional assistance regarding electronic monitoring or cameras, please contact Jason Ross at (512) 463-8088.

Please don't hesitate to contact me if you need additional assistance.

Sincerely,

Wendy Wisneski
Critical Incident Inspector
Texas Commission on Jail Standards
P.O. Box 12985
Austin, TX 78711
512-463-8081 office
512-799-6648 cell
wendy.wisneski@tcjs.state.tx.us

101.    Ms. Wisneski warned Sheriff Carrillo:

Please ensure your personnel receive training on how to properly complete the suicide screening instrument, and on proper notification to required entities.  Please ensure procedures are in place for placing inmates on suicide precautions, if needed, and personnel are trained on these procedures.  Please provide copies of in-service training attendance rosters.

Additionally, please submit a floor pan identifying locations of any electronic monitoring devices and/or cameras serving 'at risk' cells.  (Please see attached Technical Assistance Memo dated November 10, 2017).

If you require additional assistance regarding electronic monitoring or cameras, please contact Jason Ross at (512) 463-8088.

Please don't hesitate to contact me if you need additional assistance.

102.    It appears that Sheriff Carrillo ignored what he was instructed to do by the TCJS. He simply decided not to follow instruction by the TCJS and thereby put John at risk.  Not only he, but all other Individual Defendants, failed and refused to complete the suicide screening form for John.  They failed to put John on suicide precautions, even though they knew they were required to do so as a result of the suicide screening form not being completed.  Thus, Sheriff Carrillo, as upon information and belief the chief policymaker for the County or the delegated chief policymaker for the County regarding jail operations, such delegation being made by the County Commissioners, chose to implement custom and practice contrary to written policies and contrary to instruction by the TCJS.  That custom and practice was demonstrated by all Individual Defendants' actions and inaction related to John's death.  This is particularly troubling, and is further indicative of John's death being completely unnecessary, when considering Sheriff Carrillo's statement to the Texas Rangers regarding Ms. Kopera's death:

My name is Oscar Carrillo; I am a commissioned peace officer and have been the Sheriff of Culberson County since 2001.

On 10/28/2017, I was off-duty and currently at my residence in Van Horn. I was contacted by my Culberson County Sheriff's Office Dispatch and was advised there was a hanging inside the jail. I advised them I was on my way. l arrived quickly after and went into the cell block. I went inside the cell and noticed Culberson County Sheriff's Office Deputy's Olivia Legarreta and Culberson County Sheriff's Office Deputy Pete Melendez were also around. I went inside the cell and observed a female inmate hanging by a bed sheet, tied around her neck, connected to a shelf. I went and checked the pulse of the female inmate and noticed she was very warm and flaccid. The female inmate was not suspended in the air and her feet were touching the ground.

We began to pick her up and the sheet was cut to remove her from the shelf. I untied the knot that was around her neck to remove the sheet I then placed the female inmate on the bed. Deputy Melendez started chest compressions and Deputy Legarreta began giving breaths to the female inmate. Shortly after, EMS arrived and took over the scene. EMS placed the female inmate on a gurney, rolled her out to the ambulance, and transported her to the Van Horn Hospital. My involvement ended at this point.

103.     Moreover, Deputy Melendez was put on notice that he had to act appropriately with regard to John.  Deputy Melendez worked for Culberson County and learned specifics regarding Ms. Kopera's death.  He indicated these specifics in his statement provided to the Texas Ranger:

I am voluntarily submitting this statement to the Texas Ranger Brent Mata. I am giving this statement without any threats or promises and on my own free will, This statement may be used for whatever purpose deemed necessary. I would prefer Texas ranger Brent Mata type this statement as I speak.

My name is Pete Melendez; I am currently a Deputy Sheriff for the Culberson County Sheriff's Office. I have been a Peace Office since 1999 and have worked for the Culberson County Sheriff's Office since 2010.

On 10/28/2017, I was currently off duty and with Culberson County Sheriff's Office Deputy Olivia Legarreta at the Culberson County Sheriff's Office located at 210 La Caverna in Van Horn. At 2:42 PM, Culberson Sheriff's Office Dispatch contacted Deputy Legarreta via telephone. Deputy Legarreta was advised a female inmate had hung themselves at the Culberson County Jail. Deputy Legarreta and I proceeded across the street and went directly inside the jail. We went to the second cell on the left and observed Deputy Legarreta look inside the tray door opening to see what was happening. I instructed dispatch to contact EMS. Culberson County Sheriff Oscar Carrillo arrived and went inside the cell with Deputy Legarreta. I observed the female inmate lifeless, eyes closed, hanging by her neck from a bed sheet. Sheriff Carrillo went and picked the female inmate up to relieve the pressure and requested me to get a knife. I went to the

kitchen to get a knife and handed Sheriff Carrillo the knife. Sheriff Carrillo or Deputy Legarreta cut the bed sheet above her neck. Sheriff Carrillo held her body and Deputy Legarreta untied the knot from her neck.

Sheriff Carrillo then placed the female inmate in the bed and I began CPR. I performed chest compressions and Deputy Legarreta went to get a mask to the the breathing portion. Sheriff Carrillo asked the inmate next to this cell when the last time they heard from this inmate. The inmate next door said around fifteen minutes. Sheriff Carrillo stated the female inmate was still warm and Deputy Legarreta stated she did not have a pulse. EMS arrived around ten minutes later and brought a gurney to the cell. We placed the female inmate in the gurney, strapped her down, and moved her to the ambulance. EMS began chest compressions and oxygen in the ambulance. I then drove the ambulance to Van Horn Hospital. EMS and hospital personnel continued to work on her and developed a pulse. I have not had any contact with this female inmate since she has been incarcerated. I have not heard of any issues involving her by anyone else.

104.    While it was unnecessary, to show liability in this case, for any Individual Defendant to learn of issues related to Ms. Kopera's death, such knowledge certainly solidifies the unreasonableness and deliberate indifference of those Individual Defendants who learned of it. There was simply no excuse for the way in which John was treated based upon knowledge of all Defendants.

### c.    TCJS Records Demonstrating Culberson County Practices and/or Customs

105.    TCJS reports and documents of inspections of the Culberson County jail further demonstrate these and other policies, practices, and/or customs which, when applied individually and/or working together, caused, were proximate causes of, and/or were producing causes of damages and death asserted in this pleading.  Culberson County had a history of failing to meet minimum jail standards promulgated by the TCJS.

106. On March 8, 2012, the TCJS inspected the Culberson County jail. The TCJS determined that deficiencies existed and, if uncured, could result in issuance of a remedial order to the County.  The TCJS inspector noted the following:

- the jail needed to ensure that all future annual fire inspections were completed by a certified fire inspector;

- the jail was to ensure that all forms were completed to include signatures and dates where applicable;

- the jail was to provide a copy of the classification book for review and to assist jailers' understanding of assaultive felonies and other questions submitted;

- the jail was to ensure that any magistrate notification is made in writing, documenting the time and date notification occurred. Such notifications must be made in writing and sent either by email (printed and kept in medical file), by fax (copy of fax verification kept in medical file), or by written documentation, signed and dated by the Judge and a copy kept in the medical file; and

- the inspector determined that there were at least four employed jailers who did not even have a valid temporary jailers license: Melinda Vitella; Jennifer Velez; Cody Davis; and Manuel Urias.

107.  Thus, the jail was not ensuring that notification to a magistrate judge of an inmate with mental health issues was actually occurring.  Notification to a magistrate judge is an important safeguard required by Texas law.  Further, the jail even had several people working for it without jailer's licenses.  If a jailer does not possess a license, then he or she likely has not received the education, training, and/or testing to prove competency.  This would undoubtedly result in injury to and/or death of inmates.

108.  On April 4, 2016, the TCJS again inspected the Culberson County jail.  The inspector determined that deficiencies existed, and the Culberson County jail was listed as being non-compliant.  The inspector learned that the Culberson County jail was operating, even though a state fire marshal inspector had determined on March 21, 2016 that the jail did not pass that annual inspection.   The inspector also noted that several jailers were performing inmate

classification duties, even though they did not have documented classification training. Thus, jailers were making decisions as to where to house inmates within the jail without being trained as to how to do so. As noted in this pleading, the County was cited once again regarding classification issues related to John's death.

109.    On January 26, 2017, the TCJS conducted another inspection of the Culberson County jail. Once again, the Culberson County jail failed the inspection. The inspector noted that deficiencies existed, and the Culberson County jail was once again listed as non-compliant. The inspector determined that the Jail Adminstrator, Valerie Flores, has been issued a temporary jailer's license on January 11, 2016. That license expired one year later – on January 11, 2017. Amazingly, the jail administrator was working at the jail without any jailer's license. Thus, upon information and belief, she had not received either the education and/or training required to be the jail's administrator.

110.    On February 22, 2017, the TCJS once again inspected the Culberson County jail. The TCJS inspector had to provide technical assistance. The inspector noted that some jailers were not logging CCQ mental health matches on the intake screening form. A CCQ match is extreamly important, as it indicates that a person has previously received typically in-patient mental health treatment. This can be a significant indicator of self-harm tendencies. The inspector also noted that the jail did not have any jailers or staff who had completed a food handler training course.

111.    On December 5 2018, just a few months before John's death, the TCJS again inspected the Culberson County jail. The inspector provided the following technical assistance:

> During the review of Suicide Prevention Training, it was determined the administration was under the impression that Mental Health Training (4900) covered the required suicide prevention training. It was explained to the administration 4900 did not cover the required training and they would need to

conduct suicide prevention training with all staff according to their operational plans. The administration advised they would conduct the required training immediately with jail staff. Follow up Action Required – The administration will scan and email this inspector the documented training by December 30, 2018. Failure to complete the required training may result in the issuance of a notice of non-compliance.

Thus, Culberson County, and Sheriff Carrillo signing on behalf of the County, was once again reminded of the importance of appropriate suicide prevention training and dealing with suicidal inmates.

112.    The policies, practices, and customs referenced in this pleading, which indicate Culberson County's unreasonableness and deliberate indifference regarding its jail detainees, were further evidenced by an inspection occurring after (but unrelated to) John's death. This inspection occurred on December 2, 2019. The inspector had to provide techical assistance. The inspector determined that Jailer Felix Gonzalez did not have the required four-hour course entitled "Objective jail Classification" as required by minimum jail standards for any staff member who was assigned to classify inmates. Thus, there was still a lax attitude by Sheriff Carrillo and the County regarding appropriate training for jailers. More importantly, for purposes of claims in this complaint, this was evidence of policy, practice, and/or custom which pre-existed John's incarceration and death.


III.    Causes of Action

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

113.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id.* at 2470. The Court determined the following issue: "whether, to

prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

114.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

115.    It appears that this objective reasonableness standard is now the law of the land. In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418. The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted). The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a

case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20. A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless." *Id.* at 420 (citation omitted). However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit. *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996). In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The *en banc* court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read

116.    The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*.  First, the panel was bound by the Fifth Circuit's "rule of orderliness."  *Id.* at 420 n.4.  Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims.  *Id*.  Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*.  *Id*.  Even so, the Fifth Circuit noted, years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

117.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

B.    Remedies for Violation of Constitutional Rights

118.    The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Ms. Edmiston individually, and Ms. Holman on behalf of Ms. Edmiston and Claimant Heirs, seek for causes of action asserted in this complaint, all remedies

---

*Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If the Decedent had lived, the Decedent would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiffs incorporate this remedies section into all sections in this complaint asserting cause(s) of action.

> C.      Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

119.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiffs and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the Decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished.  These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution. Pre-trial detainees are entitled not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

120.    Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored the Decedent's obvious serious mental health issues and/or self-harm tendencies, and they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those tendencies.  They failed to protect the Decedent, and their actions and/or inaction referenced in this pleading resulted in unconstitutional punishment of the Decedent.  Individual Defendants were aware of the excessive

risk to the Decedent's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death. Moreover, they in fact drew that inference. Individual Defendants violated clearly–established constitutional rights, and their conduct was objectively unreasonable in light of clearly–established law at the time of the relevant incidents.

121.    All Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts asserted in this pleading, all Individual Defendants' actions and inaction meet all three elements. They are therefore also liable to Plaintiffs and Claimant Heirs pursuant to this theory.

122.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Some constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, flow from the 14th Amendment's Due Process Clause. *Id*. Since such constitutional protections flow from the same clause, analysis of what is necessary to prove such constitutional violations is identical.

123.    Individual Defendants are not entitled to qualified immunity.[2]  Their denial of reasonable medical/mental health care, and other actions and/or inaction set forth in this pleading, caused, proximately caused, and/or were producing causes of the Decedent's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiffs and Claimant Heirs.

---

[2]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they are entitled to qualified immunity.  This should be Individual Defendants' burden, if they choose to assert the alleged defense.  Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983.  *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring).  Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights.  Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting).  Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiffs include allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

124.     Therefore, the Decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek compensation from Individual Defendants:

- the Decedent's conscious physical pain, suffering, and mental anguish;

- the Decedent's medical expenses;

- the Decedent's funeral expenses; and

- exemplary/punitive damages.

125.     Plaintiffs also seek and are entitled to all remedies and damages available to Shannon Edmiston, Lisa Williams a/k/a Lis Schubert, E.S., J.S. #1, and J.S. #2, individually, for 42 U.S.C. § 1983 claims for constitutional violations.  Shannon Edmiston seeks such damages for the wrongful death of her son, Lisa Williams a/k/a Lisa Schubert seeks such damages for the wrongful death of her spouse, E.S. seeks such damages for the wrongful death of her father, J.S. #1 seeks such damages for the wrongful death of his father, and J.S. #2 seeks such damages for the wrongful death of her father.  Those damages were caused and/or proximately caused by Individual Defendants.  Their actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by Ms. Edmiston and/or Claimant Heirs, for which they are entitled to compensation for:

- loss of services that Ms. Edmiston and/or Lisa Williams a/k/a Lisa Schubert would have received from John;

- expenses for John's funeral;

- past mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- future mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- loss of companionship and/or society that Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 would have received from John;

- loss of consortium that Lisa Williams a/k/a Lisa Schubert would have received from John; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of the Decedent's constitutional rights. Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, the Decedent's rights and safety. Moreover, Ms. Edmiston, individually, and Ms. Holman, on behalf of Ms. Edmiston and Claimant Heirs, seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

### D.    Cause of Action Against Culberson County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

126.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Culberson County is liable to Plaintiffs and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the Decedent's rights to reasonable medical/mental health care, to be protected, and/or not to be punished. These rights are guaranteed by at least the 8th and/or 14th Amendments to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

127.    The County acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times. The County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate

causes of the Decedent's suffering, damages, and death, and all damages suffered by Ms. Edmiston and Claimant Heirs.

128.    The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleading stage.   Nevertheless, out of an abundance of caution, the sheriff of the County was the County's relevant chief policymaker over matters at issue in this case.   Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case.   Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

129.    The County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.   It also acted in an objectively unreasonable manner.   Policies, practices, and/or customs referenced above were moving forces behind and caused violation of the Decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.   The County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to the Decedent.   Therefore, the Decedent's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from the County:

- The Decedent's conscious physical pain, suffering, and mental anguish;

- The Decedent's medical expenses; and

- The Decedent's funeral expenses.

130.    Plaintiffs also seek and/or are entitled to all remedies and damages available to Shannon Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1, and J.S. #2, individually, for 42 U.S.C. § 1983 claims for constitutional violations.   The County's policies, practices, and/or

customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Ms. Edmiston and Claimant Heirs:

- loss of services that Ms. Edmiston and/or Lisa Williams a/k/a Lisa Schubert would have received from John;

- expenses for John's funeral;

- past mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- future mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- loss of companionship and/or society that Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 would have received from John; and

- loss of consortium that Lisa Williams a/k/a Lisa Schubert would have received from John.

Moreover, Plaintiffs and Claimant Heirs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.    Concluding Allegations and Prayer

### A.    Conditions Precedent

131.    All conditions precedent to assertion of all claims herein have occurred.

### B.    Use of Documents at Trial or Pretrial Proceedings

132.    Plaintiffs and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.      Jury Demand

133.    Plaintiffs and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

D.      Prayer

134.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)      actual damages of and for Ms. Edmiston, individually, and Ms. Holman, as administrator of the referenced estate, and for Claimant Heirs, including but not necessarily limited to:

- John's conscious physical pain, suffering, and mental anguish;

- John's medical expenses;

- expenses for John's funeral;

- loss of services that Ms. Edmiston and/or Lisa Williams a/k/a Lisa Schubert would have received from John;

- past mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- future mental anguish and emotional distress suffered by Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 resulting from and caused by John's death;

- loss of companionship and/or society that Ms. Edmiston, Lisa Williams a/k/a Lisa Schubert, E.S., J.S. #1 and J.S. #2 would have received from John; and

- loss of consortium that Lisa Williams a/k/a Lisa Schubert would have received from John;

b)      exemplary/punitive damages for Plaintiffs and Claimant Heirs, from Individual
        Defendants;

c)      reasonable and necessary attorneys' fees for Plaintiffs and Claimant Heirs, through
        trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§
        1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiffs and
        Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


    /s/ T. Dean Malone
    T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:      (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:      (214) 670-9904

Attorneys for Plaintiff